## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

MARK MURPHY,                          )          CASE NO. 8:09CV89
                                      )
      Plaintiff,                     )
                                      )
      vs.                            )          MEMORANDUM
                                      )          AND ORDER
MICHAEL J. ASTRUE,                    )
Commissioner of the Social Security   )
Administration,                       )
                                      )
      Defendant.                     )

        This matter is before the Court on the denial, initially and on reconsideration, of the Plaintiff's disability insurance ("disability") benefits under the Social Security Act ("Act"), 42 U.S.C. §§ 401, et seq., and supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq.  The Court has carefully considered the record and the parties' briefs.

### PROCEDURAL BACKGROUND

        The Plaintiff, Mark Murphy, filed for disability and SSI benefits on March 31, 2004.[1] (Tr. 91-93.)  The claims were denied initially and on reconsideration.  (Tr. 69-80.)  An administrative hearing was held before  Administrative Law Judge ("ALJ") James Francis Gillett on March 31, 2008.  (Tr. 20.) On July 8, 2008, the ALJ issued a decision finding that Murphy was not "disabled" within the meaning of the Act and therefore is not eligible for either disability or SSI benefits.  (Tr. 36.)   On February 10, 2009, the Appeals Council denied Murphy's request for review.  (Tr. 6-8.)  Murphy now seeks judicial review of the

---

     [1]The record also includes one previous application dated March 31, 2004 (Filing No. 88) and information relating to denials of these earlier applications.  (Tr. 55-68.)

ALJ's determination as the final decision of the Defendant, the Commissioner of the Social Security Administration ("SSA").  (Filing No. 1.)

Murphy claims that the ALJ's decision was incorrect because: 1) the ALJ failed to assess the functional limitations caused by his mental illnesses and the effect of his substance abuse; 2) the ALJ failed to satisfy regulatory requirements relating to the Dictionary of Occupational Titles ("DOT"), published by the U.S. Department of Labor, which he also argues is "outdated"; 3) the VE's testimony lacked foundation regarding the number of jobs available nationally when discussing jobs within Murphy's residual functional capacity ("RFC"); and 4) assuming that the VE's testimony was supported by adequate foundation, the numbers given by the VE do not amount to a "significant number" of available jobs.

Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits is supported by substantial evidence on the record as a whole.  Therefore, the Court affirms the Commissioner's decision.

## FACTUAL BACKGROUND

**Murphy's Testimony**

At the hearing, Murphy testified to the following.  He was then fifty-three years old. He was enrolled in special education classes and graduated from high school.  (Tr. 839.) He reads on a second grade level with difficulty.  (Tr. 839-40.)  He has tried to pass the written driver's license test for a "couple" of years.  He failed the test, administered both written and orally, three or four times.

2

Regarding his medical condition, Murphy testified that his sarcoidosis mostly affects his legs and feet. (Tr. 841.) His feet or knees are painful once a week, and the swelling lasts two or three days per week. He obtains relief through injections or "pills." (Tr. 842.) Murphy was given, at a free clinic, a splint that he wore on his right wrist at the hearing. (Tr. 843-44.) He sought medical attention for the problem, which was still undiagnosed at the time of the hearing.[2] (Tr. 843.) He described the problem as a half-inch bump under his wrist with swelling on, and pain in, the wrist. He is right-handed. (Tr. 843, 845.) Murphy testified that he was prescribed Ambien for sleep and Abilify for his mental state. (Tr. 846-47.) He described his mental condition as sometimes not understanding things, being violent, having sleep "disorders," and being alternately happy and sad. He stated that his violent episodes do not involve alcohol use "too much." He stated that his last violent incident was when he fought with his girlfriend in March of 2006, after he had been drinking. As a result of that incident, he spent two months in jail and was also sentenced to one year probation. He testified that he had not had alcohol since that time. (Tr. 847.) Since then he has had thoughts of violence but has not acted on them. Between 2000 and 2006 or 2007, Murphy estimated that he was involved in approximately fifteen violent incidents. He was "caught" only five times, for incidents that involved either his girlfriend or his wife. (Tr. 848-49.) Approximately eight of those violent incidents occurred with both men and women between 2004 and 2007. (Tr. 849.) He estimated that in two of those eight situations he had been drinking. Murphy testified that he has gone, sporadically, to the rehabilitation program at a mental health facility, Community Alliance. Murphy has

_____

[2]Murphy testified that he missed an appointment at the Douglas County Hospital, which resulted in his being "cancelled for a month" at that facility. (Tr. 843.)

heard and seen things that he knows do not exist.  (Tr. 850.)  Murphy hears voices that tell him to do things.  He has named four voices as follows: Rambo (tells him to be violent and to "fight and do bad things"); Chubbs (tells him it's "okay to eat [himself] to death"); Poopsie (tells him to be home or family oriented); and "Swe[e]t Pea" (tells him to hustle and take advantage of people).  (Tr. 851.)  He hears the voices often, and Rambo is the most active.  Murphy became tired of getting in trouble and going to jail, so he started controlling Rambo a couple of years before the hearing.  (Tr. 852.)  Rambo becomes more active when Murphy thinks that the government is against him or when he has pain.  Murphy lives alone in an apartment paid for with general assistance.  He receives food stamps.  He keeps his apartment clean and goes to the grocery store.  (Tr. 853.)

Murphy testified that he cannot work full-time because: he cannot focus or remember things; the voices in his head bother him; he has trouble sleeping; his mind is confused, making him happy one moment and sad the next; he can't stand for a long period because of the sarcoidosis, which was worsening at the time of the hearing.  (Tr. 855.)  Murphy testified that despite his health issues he shot basketball hoops in September 2007, with his feet flat on the floor and using his right hand.  (Tr. 856.)  Murphy has tenosynovitis in both knees and ankles and his right wrist.  He no longer shoots pool due to his pain.  (Tr. 857.)

Murphy did not acknowledge a document stating that he was not attending Community Alliance three times weekly as recommended and had missed several appointments with the staff regarding a referral without calling.  He became homeless about four months before the hearing, and he then stayed with his sister.  (Tr. 858.)

4

Murphy testified that he last worked, about six months to a year before the hearing, for a cleaning service.  Murphy stated that the job lasted only about four to five months because he was too slow.  (Tr. 860.)  He also worked through Omaha Temporary Service cleaning up dough from a floor and making boxes.  (Tr. 861.)  He also painted apartments on the inside.  Because of his fear of heights he did not use ladders or scaffolding.  (Tr. 862.)  Murphy stated that he lasted only a "couple" of months as a painter because he was sloppy.  (Tr. 863.)

**Medical Expert's Testimony**

Dr. Thomas England testified as a medical expert.  Dr. England reviewed the record and noted the following diagnoses: a possible bipolar affective disorder, type II; expressive receptive language disorder; antisocial personality disorder and antisocial traits; and alcohol abuse, in remission.  (Tr. 865-67.)  He noted paranoia and hallucinations at a moderate level.  (Tr. 879.)  Dr. England saw no medical reason for Murphy's failure to appear for programs or appointments at Community Alliance.  (Tr. 871.)  He noted some evidence of noncompliance with medications.  (Tr. 877.)

Addressing Murphy's alcohol use, Dr. England stated that the frequency and level of use are not clear from the record.  He noticed a connection between alcohol use and violent and antisocial behavior.  Dr. England opined that alcohol use impaired Murphy's daily activities and social functioning markedly.  (Tr. 872.)  Dr. England opined that Murphy would work better in situations involving limited changes and little contact with the public, coworkers and supervisors.  (Tr. 874.)

Dr. England noted inconsistencies in the record relating to the last use or indication of possible use of alcohol.  (Tr. 867.)  Dr. England saw evidence of active alcohol abuse

5

until late 2006 or early 2007. (Tr. 881.) Dr. England concluded that Murphy's alcohol use lasted until "through about mid [20]07." (Tr. 868.)

**Vocational Expert's Testimony**

Testimony was also heard from a vocational expert ("VE"), Anita Howell, under contract with the Social Security Administration ("SSA"). (Tr. 883-906.) Considering a hypothetical with characteristics including Murphy's age, experience, and RFC, the VE testified that the hypothetical claimant could work as an order caller (330 jobs in Nebraska; 40,400 jobs nationally) and an assembler of small products (175 jobs in Nebraska; 700 jobs in the applicable four-state region; and approximately 14,160 in the national economy). (Tr. 884-94.) The VE obtained the numbers of available jobs from a publication of the U.S. Department of Labor, Bureau of Labor Statistics, and also from the Nebraska Labor Department. (Tr. 896.) Those entities obtain their numbers from annually updated census figures. (Tr. 897.) The VE explained that she last did a labor market survey in the summer of 2007 to update the U.S. Department of Labor/Nebraska Labor Department statistics for the relevant positions. (Tr. 898-901.)

**Documentary Evidence Before the ALJ**

In addition to oral testimony, the ALJ considered medical evidence. The record shows that on May 13, 2004, Rosanna Jones–Thurman, Ph.D., performed a consultative psychological examination. (Tr. 458–62.) Her IQ test of Murphy revealed a verbal score of 77, a performance score of 97, and a full-scale score of 85, placing him at the low-average range of intelligence. (Tr. 459.) She noted a possible learning disability and that Murphy could not read certain words correctly. (Tr. 460.) Dr. Jones–Thurman opined that

6

Murphy could concentrate and carry out simple instructions, but she noted that he might have problems relating to coworkers and supervisors. She diagnosed the following: bipolar II disorder; a language disorder; impulse-control disorder; and alcohol dependence, "allegedly in remission." (Tr. 461.) She assigned a Global Assessment of Functioning ("GAF") score of 60. (*Id.*)

On May 24, 2004, Murphy reported to Ziad Zawaideh, M.D. with high blood pressure. Dr. Zawaideh's examination was unremarkable. He counseled Murphy on lifestyle modifications that included diet, alcohol intake, sodium intake, exercise, and smoking cessation. (Tr. 472.)

On July 1, 2004, Linda Schmechel, Ph.D., a state disability determination services ("DDS") psychologist, completed a psychiatric review technique form. (Tr. 367–80.) She diagnosed Murphy with bipolar II disorder and impulse-control disorder, and was moderately limited at interacting with the public and understanding, remembering, and carrying out detailed instructions. (Tr. 370, 374, 377, 381–82.) In all other areas, however, Dr. Schmechel found that Murphy was not significantly limited. (Tr. 381-82.)

Murphy went to a medical clinic on August 11, 2004, complaining of a swollen knee. (Tr. 527–28.) A physician diagnosed arthritis and performed a joint aspiration procedure. (Tr. 528.) On August 19th, 2004, Murphy stated that his pain was almost gone and asked to return to work. (Tr. 525.)

On September 7, 2004, Dr. Millicent Palmer, M.D., noted lesions on Murphy's eyelids. (Tr. 573.) On September 13, 2004, Dr. Palmer excised the lesions. (Tr. 570.) A biopsy on the removed tissue indicated sarcoidosis. (Tr. 568, 571.) Chest x-rays performed on September 13, 2004, revealed "diffuse interstitial lung disease." (Tr. 569.)

7

On September 15 and 17, 2004, Dr. Palmer again examined Murphy.  (Tr. 563-64.)  She referred Murphy to Jay Kenik, M.D., a rheumatologist, who examined Murphy on September 20, 2004.  Dr. Kenik noted Murphy's diffuse skin lesions, regular heart rate and rhythm without murmur, symmetric reflexes, and full strength.  (Tr. 554-55.)  Dr. Kenik diagnosed severe cutaneous sarcoidosis and prescribed prednisone (Tr. 556.)  On October 4, 2004, Dr. Kenik again examined Murphy, noting that Murphy was "doing dramatically better" on medication, with "significant shrinkage of the lesions."  (Tr. 553.)  On November 8, 2004, Dr. Kenik noted that Murphy's skin lesions had resolved.  (Tr. 551.)

On October 14, 2004, Radhika Madhu, M.D., performed a consultative examination.  (Tr. 529–36.)  Murphy reported occasional back pain, but he could stand for two hours and sit for an unlimited time without pain.  He stated that he could climb stairs, handle objects, and travel.  However, he had difficulty kneeling, crawling, and stooping.  He could not lift more than seventy-five pounds.  (Tr. 529.)  Dr. Madhu saw that Murphy had no back tenderness or spasms, no antalgic gait, and he retained a good range of motion.  (Tr. 534.)  Dr. Madhu noted that spine x-rays were normal.  He also found that he could not elicit range of motion restrictions despite Murphy's complaints.  (Tr. 535.)

On October 24, 2004, a second DDS psychologist completed a psychiatric review technique form.  The second psychologist affirmed Dr. Schmechel's July assessment.  (Tr. 385.)

On January 20, 2005, Dr. Kenik again examined Murphy.  (Tr. 549.)  He noted tenderness and swelling in Murphy's left knee, though Murphy observed a "fairly well maintained" range of motion.  He aspirated the knee.  (Tr. 549.)  Dr. Kenik also told the county assistance office that Murphy's sarcoidosis and associated arthritis prevented him

8

from working.  (Tr. 550.)  On March 31, 2005, Dr. Kenik noted that Murphy had some thin lesions on his neck, a very small knee effusion, and "well maintained" range of motion. Generally, the knee was stable.  (Tr. 547.)

On March 7, 2005, a DDS physician completed a non-examining physical RFC assessment.  (Tr. 386–94.)  The physician noted Murphy's normal gait and his well-managed sarcoidosis (Tr. 394.)  He concluded that Murphy could: occasionally lift fifty pounds and frequently lift twenty-five pounds; and sit, stand, and walk for about six hours in an eight-hour workday.  (Tr. 387.)  He concluded that Murphy's sarcoidosis was well managed with his medications, and he found Murphy to be "partially credible" and able to work.  (Tr. 394.)

Also on March 7, 2005, Lee Branham, Ph.D., another DDS psychologist, completed a psychiatric review technique form.  (Tr. 395–411.)  He opined that Murphy was moderately limited at understanding, remembering, and carrying out detailed instructions. Otherwise, however, he was not significantly limited in the areas of understanding, memory, sustained concentration, and persistence.  (Tr. 409.)

On March 31, 2005, Dr. Kenik again told the Douglas County Department of General Assistance that Murphy could not work.  (Tr. 548.)  On May 17, 2005, Murphy went to a county community mental health center.  (Tr. 658–63.)  His examiner assessed possible dissociative identity disorder, phychosis, or an attention disorder.  (Tr. 665.)  His GAF score was 65.  (Tr. 659.)  He received samples of Abilify and began a twelve-month treatment plan.  (Tr. 665-67.)  His assessment team estimated that he could achieve the highest level of progress in the target areas entitled residential and community support/daily structure. (Tr. 667.)

9

On June 6, 2005, Murphy went to a medical clinic and complained of hip problems. (Tr. 652.)  A physician referred Murphy to physical therapy and informed the county that while Murphy could work, he should not lift more than fifteen pounds.  (Tr. 651, 653.)  On June 23, 2005, Michael Gillespie, Ph.D., conducted psychological testing.  (Tr. 645–46.) He noted Murphy's claim that four different personalities told him to do "things [he] shouldn't."  (Tr. 646.)  Dr. Gillespie observed that a personality test revealed that "a deliberate effort was made to emphasize pathology."  (Tr. 645.)  He opined that while Murphy was exaggerating at least to some extent, a possibility of schizophrenia existed. (*Id.*)  Dr. Gillespie noted Murphy's persistent denial regarding substance abuse in light of his past DUIs and an alcohol-related emergency-room visit.  (Tr. 646.)  Dr. Gillespie concluded that Murphy's psychiatric, social, and occupational histories "most strongly suggest a likely chemically-dependent man overemphasizing serious symptomatology in an effort to appear markedly mentally ill." (*Id.*)

On July 15, 2005, Murphy returned to the mental health center.  He reported sleeping two hours nightly.  His examiner noted that he showed no overt psychosis and seemed well-rested.  The examiner referred Murphy to vocational rehabilitation services. (Tr. 644.)

On July 20, 2005, Rebecca Braymen, Ph.D., another DDS psychologist, affirmed Dr. Branham's March 2005 assessment.  (Tr. 413.)  On September 9, 2005, Murphy again went to the county mental health center, claiming that he had intentionally struck himself in the head.  (Tr. 639.)  A drug test was negative.  (Tr. 642.)  On September 27, 2005, a physical therapist examined Murphy.  (Tr. 634).  Murphy stated that he only experienced some pain in his lower back at night, and with stretching the pain goes away.  He was given daily stretching exercises and discharged from physical therapy.  (Tr. 634.)

10

On September 27, 2005, Murphy was again at the mental health center.  He said that he stopped taking his medication because he felt like a "zombie."  (Tr. 635.)  He said that he was frustrated because he could not read job applications.  (*Id.*)  On October 13, 2005, he reported that at the community center a tutor would be assigned to teach him to read.  The following day he denied anxiety and irritability, but he reported sleep problems.  (Tr. 633).  Murphy continued to return to the mental health center.  (Tr. 632.)  On December 9, 2005, he reported breaking a window in his apartment.  On December 22, 2005, Murphy expressed disappointment in the learning center because of minimal one-on-one time for reading help.  (Tr. 631.) On January 18, 2006, Murphy reported that he was more confident with his reading, was starting a part-time job the next week, and thought that his issues had resolved.  (Tr. 628.)

On January 30, 2006, Dr. Kenik examined Murphy, who reported recurring skin problems and said that he had not been taking his medication.  (Tr. 546.)  On February 1, 2006, Murphy again went to the mental health center, where he denied experiencing anxiety, depression, paranoia, or hallucinations.  (Tr. 623.)  On February 13, 2006, Dr. Kenik saw Murphy for a follow-up examination and noted that his skin was "much better" after restarting his medications.  (Tr. 545.)  On March 8, 2006, Murphy told his examiner at the mental health center that police came to his home due to his disorderly conduct.  He denied depression and anxiety.  His examiner assessed schizoaffective disorder.  (Tr. 621.)

On April 6, 2006, Dr. Kenik saw Murphy and adjusted his medication.  (Tr. 543.)  On May 3, 2006, Murphy returned to the mental health center.  He reported not taking all of his medications and feeling depressed.  He also complained of sleep problems.  (Tr. 618.)

11

On June 2, 2006, Murphy told Dr. Kenik that his eyelid problem resurfaced when he stopped his medication. Dr. Kenik restarted Murphy's prescriptions, and discussed the importance of medication compliance. (Tr. 542.) On June 28, 2006, Murphy told his examiner at the mental health center that he discontinued his antidepressant because it was ineffective. He also claimed that he heard voices telling him to hurt himself. (Tr. 616.) On July 25, 2006, Dr. Kenik observed that Murphy was doing well on his medications. (Tr. 540.)

On August 23, 2006, Murphy returned to the mental health center and reported a recent fight. (Tr. 609.) On October 24, 2006, he reported being arrested for slapping a woman. His examiner referred him to anger management services. (Tr. 602.) A drug test administered on that date was positive for alcohol. (Tr. 606.)

On October 27, 2006, Dr. Kenik examined Murphy, who reported increased symptoms when he stopped taking his medications. Dr. Kenik noted clear lungs, no new skin lesions, and no active joint inflammation. (Tr. 717.)

On November 21, 2006, Murphy returned to the mental health center. He indicated that his mood improved because the woman he hit bailed him out of jail and dropped charges. His examiner noted that Murphy probably minimized his alcohol use and provided inconsistent information about hallucinations. (Tr. 596.) A drug test was negative. (Tr. 601.)

On December 4, 2006, a social worker and licensed mental health practitioner, Yukari Kojima, performed a chemical dependency assessment. (Tr. 589–95.) Murphy expressed an extreme need for alcohol treatment and no need for drug treatment. (Tr. 590.) He also reported being jailed for seven days after fighting his friend while intoxicated.

12

(Tr. 591.)  Kojima diagnosed alcohol dependence, told Murphy to abstain from all mood-altering chemicals, attend outpatient treatment, attend AA meetings, and continue his psychiatric care.  (Tr. 594-95.)  Kojima assigned Murphy a GAF score of 65.  (Tr. 595.)

On January 8, 2007, Murphy went to the mental health center.  He reported recent fights, a recent suicidal impulse, and being evicted from his apartment and having to live at a homeless shelter.  (Tr. 700.)  A drug test was positive for alcohol.  (Tr. 713.)

On January 22, 2007, Dr. Kenik examined Murphy.  Murphy reported some arthralgia of his right foot during the previous week.  Dr. Kenik noted clear lungs, no skin lesions, and no active joint inflammation.  (Tr. 716.)  On February 2, 2007, Murphy complained to Dr. Kenik of right foot pain.  Dr. Kenik observed low-grade swelling.  He increased Murphy's medication, and Murphy declined an aspiration of his foot. (Tr. 715.)

On March 5, 2007, Murphy went to the mental health center with complaints of continued anger issues.  (Tr. 695.)  A March 7, 2007, drug test was negative.  (Tr. 712.)  On June 4, 2007, Murphy returned to the mental health center, stating that indicated that he missed his last appointment because he was in jail for "head butting" his girlfriend."  (Tr. 694.)  Murphy said that he had used his medication "off and on."  (*Id.*)  He smelled of alcohol.  (*Id.*)  On July 5, 2007, Murphy returned to the mental health center.  (Tr. 693).  At his July 9, 2007, visit his examiner noted that he minimized a recent altercation with his ex-girlfriend and tried to blame his actions on vague auditory hallucinations.  (Tr. 691.)  A drug test was negative.  (Tr. 711.)

On July 10, 2007, Murphy went to a county medical clinic complaining of high blood pressure and knee swelling.  His medication was adjusted.  (Tr. 690).  A chest x-ray revealed no changes in Murphy's lungs since June 6, 2005.  (Tr. 708.)  On August 1, 2007,

Murphy went to the medical clinic complaining of a sprained ankle from playing basketball. (Tr. 688.) An x-ray showed mild soft tissue swelling, a possible small effusion, and minimal degenerative changes.  (Tr. 707.)  August 29, 2007, X-rays showed that the swelling had resolved with no underlying fractures.  (Tr. 705.)

On August 29, 2007, Murphy returned to the mental health center.  He said that he had not used alcohol for one or two months, and the government was following him.  (Tr. 686.) A drug test was negative.  (Tr. 706.)

On September 24, 2007, Dr. Kenik examined Murphy, who again complained that his right ankle hurt from playing basketball.  The ankle was swollen, and Dr. Kenik injected the ankle and attributed the problem to Murphy's sarcoidosis.  (Tr. 714.)

On September 27, 2007, nurse Barbara Grandt performed a chemical dependency assessment.  (Tr. 674–83.)  Murphy reported past charges for a parole violation and multiple DUIs and assaults committed when he was under the influence of alcohol.  (Tr. 677–78.) He also reported charges of disorderly conduct and public intoxication.  (Tr. 678.) Murphy explained his recent charge for domestic disturbance after head-butting his ex-girlfriend after they had been drinking.  (*Id.*)  Murphy claimed that he had been abstaining from alcohol for the last six months.  (Tr. 677.)  Ms. Grandt assessed Murphy with alcohol dependence and assigned him a GAF score of 65.  (Tr. 682.)

On November 7, 2007, Murphy went to the medical clinic with a swollen knee.  The clinic noted that Dr. Kenik had been treating the knee.  (Tr. 730.)  On December 19, 2007, he returned to the mental health clinic and denied feeling depressed, anxious, or having angry outbursts.  (Tr. 732.)  On February 13, 2008, he reported anxiety and irritation, but denied recent altercations.  (Tr. 729.)

14

On March 18, 2008, Murphy saw a physician at a community health center for a swollen wrist. (Tr. 745–46.) The Murphy could not make a fist, and his hand was weak. Murphy was referred to an orthopedic specialist. (Tr. 745.) On March 28, 2008, Murphy reported continued hand problems and had a doppler examination, which was normal. (Tr. 740.)

On March 28, 2008, Murphy went to the community mental health center. (Tr. 739). On April 14, 2008, Murphy returned to the medical clinic and complained of foot pain. (Tr. 737.) On April 19, 2008, Murphy presented at the mental health center and reported increased irritability and depression. (Tr. 750.)

On April 28, 2008, Dr. Kenik saw Murphy and noted inflammation in both knees. The doctor aspirated both knees. (Tr. 753.)

**Documentary Evidence Submitted to the Appeals Council**

After the ALJ's decision, Murphy submitted additional records of his treatment with Dr. Kenik. (Tr. 755-59.) Dr. Kenik's treatment notes reflect that Murphy's examination on June 30, 2008, showed that he was on medication and was doing well overall. (Tr. 756.) On August 18, 2008, Dr. Kenik noted a swollen right knee. Dr. Kenik treated the knee by extracting inflammatory fluid and injecting Kenalog. (Tr. 755.)

**THE ALJ'S DECISION**

After following the sequential evaluation process set out in 20 C.F.R. §§ 404.1520 and 416.920,[3] the ALJ concluded that Murphy is not disabled in either the disability or the

---

[3]Section 404.1520 relates to disability benefits, and identical § 416.920 relates to SSI benefits. For simplicity, in making further references to the social security regulations the Court will only refer to their disability regulations.

SSI context.  (Tr. 36.)  Specifically, at step one the ALJ found that Murphy last performed substantial gainful work activity on February 27, 2004.  (Tr. 23.)  At step two, the ALJ found that Murphy has the following medically determinable "severe" impairments: a reading problem; bipolar disorder; back and knee problems; tenosynovitis of the right hand; high blood pressure; sarcoidosis; schizoaffective disorder; antisocial traits; and substance abuse (in remission since June 2007).  (*Id.*)  At step three, the ALJ found that Murphy's medically determinable impairments, either singly or collectively, do not meet section 12.04 or any other section of Appendix 1 to Subpart P of the Social Security Administration's Regulations No. 4, known as the "listings."  (Tr. 23-24.)  At step four, the ALJ determined that, despite Murphy's medically determinable impairments, he possesses the RFC to perform sedentary work, with limitations.  (Tr. 24-25.)  The ALJ found that Murphy lacks the RFC to do his past relevant work.  (Tr. 26.)   At the last step, the ALJ concluded that considering Murphy's age, education, work experience, and RFC based on all of his impairments, including substance abuse disorders, no jobs exist in significant numbers in the national economy that Murphy can perform.  (Tr. 27.)  However, the ALJ found that if Murphy stopped his substance abuse, Murphy: would have the RFC to perform light work with limitations (Tr. 27-28); would not have the RFC to do his past work (Tr. 35); and could perform a significant number of jobs in the national economy (*Id.*).   Finally, the ALJ concluded that because Murphy would not be disabled if he stopped his substance abuse, his substance abuse disorder is a contributing factor material to the disability determination.  Therefore, the ALJ found that Murphy is not disabled.  (Tr. 36.)

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo*. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995); *Harris v. Shalala,* 45 F.3d 1190, 1193 (8th Cir. 1995). Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision. *Harris,* 45 F.3d at 1193.

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Id.* As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000); *Harris,* 45 F.3d at 1193.

## DISCUSSION

### *Effects of Mental and Emotional Impairments*

Murphy argues that the ALJ incorrectly assessed the functional limitations caused by his "mental illnesses" and the effect of his alcohol dependence, citing to discrete items in his medical records that reflect difficulty in those areas. (Filing No. 18, at 12-13.) These arguments relate to the determination of Murphy's RFC. RFC is defined as what Murphy "can still do despite . . . limitations." 20 C.F.R. §§ 404.1545(a)(1). RFC is an assessment

17

based on all "relevant evidence," *Id.* §§ 404.1545(a)(3), including the medical records, observations of treating physicians and others, and the claimant's own description of his limitations. *McKinney,* 228 F.3d at 863-64. Before determining RFC, an ALJ first must evaluate the claimant's credibility. In evaluating subjective complaints, the ALJ must consider, in addition to objective medical evidence, any other evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions. *See Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984); *see also* § 404.1529. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. *Polaski,* 739 F.2d at 1322. A lack of work history may indicate a lack of motivation to work rather than a lack of ability. *See Woolf v. Shalala,* 3 F.3d 1210, 1214 (8th Cir.1993) (stating that a claimant's credibility is diminished by a poor work history). The credibility of a claimant's subjective testimony is primarily for the ALJ, not a reviewing court, to decide. *Pearsall v. Massanari,* 274 F.3d 1211, 1218 (8th Cir. 2001).

Regarding his mental condition, interspersed in records to which Murphy cites indicating difficulties with his mental health are numerous references that reflect stable mental health. For example, Murphy cites to reports dated September 9, 2005, October 14, 2005, and December 9, 2005, in which it is stated that he: was distressed and tried to harm himself twice; continued nightmares and flashbacks, was paranoid and had auditory hallucinations; and had an angry outburst during which he broke an apartment window. (Filing No. 18, at 12 (citing Tr. 639, 633, 631).) Looking at the same records in which those instances are referred to, the Court also finds the following entries: on September 9, 2005,

18

together with notations that Murphy hit his head twice on purpose is a note that his attitude was improving; on October 13, 2005, Murphy was motivated to learn to read and hopeful about doing so; on October 14, 2005, his mood was stable and he displayed no anxiety; and on November 10, 2005, he was smiling, excited about a talent show, doing well with anger management, and had "full" mood and affect.   (Tr. 632, 633, 639.)   Such inconsistencies in the record lead this Court to discredit Murphy's testimony.

Murphy also argues that insufficient evidence exists to support the ALJ's finding that Murphy would only experience mild to moderate limitations absent substance abuse. However, in presenting this argument Murphy has failed to satisfy his burden of proof, i.e., that he stopped drinking and afterwards was disabled.  *Vester v. Barnhart,* 416 F.3d 886, 887 (8th Cir. 2005) (citing 20 C.F.R. § 416.935(b)(1)); *Pettit v. Apfel,* 218 F.3d 901, 901 & 903 (8th Cir. 2000) (citing 20 C.F.R § 404.1535(b)(1)).

For these reasons, substantial evidence supports the ALJ's determination of Murphy's RFC.

### Regulatory Requirements Relating to DOT; DOT is Outdated

Murphy argues that the ALJ failed to satisfy regulatory requirements relating to the DOT.  Murphy refers to Social Security Ruling 00-4p, requiring that an ALJ resolve, by questioning the VE, any conflicts between the DOT and the VE's testimony.[4]

For example, Murphy points to the ALJ's statement regarding Murphy's right hand limitations.  (Filing No. 18, at 9 & 15.)  Murphy then states that the DOT description of an "assembler, small products I" (Tr. 760) does not include these limitations, and the ALJ

---

[4]A VE's presentation of occupational evidence should be "generally" consistent with the DOT.  When conflicts exist, they must be explained.  20 C.F.R. § 00-4p.

19

never explained how an assembler would perform the job with the stated limitations. Murphy's other arguments are similar, claiming that the ALJ included requirements not specified in the DOT. However, where specific limitations are placed on a claimant's ability to perform a job, an ALJ's conclusions are based on a "perfectly acceptable basis." *Jones v. Chater,* 72 F.3d 81, 82 (8th Cir. 1995) (cited in *Page v. Astrue,* 484 F.3d 1040, 1045 (8th Cir. 2007)). Therefore, conflicts do not exist. The VE's statement that her testimony was consistent with the DOT supports the absence of conflict. (Tr. 906.)

Murphy also argues that the DOT is outdated. This argument is misplaced. Social security regulations suggest the DOT as a source for the type of information testified to. 20 C.F.R. § 404.1566(d)(1). *See also, e.g., Jones v. Barnhart,* 315 F.3d 974, 979 (8th Cir. 2003).

### *Number of Jobs Available Nationally*

Murphy argues that the VE's testimony lacks foundation regarding the number of jobs available nationally when discussing jobs within Murphy's RFC. This matter was discussed at length during the VE's testimony. (Tr. 896-905.) The VE testified that her statistics came from *Information and Statistics* published by the U.S. Department of Labor and also the Nebraska Labor Department. Those agencies obtain their numbers from the U.S. Census. (Tr. 896-97.) The VE also testified that she does labor market surveys periodically to determine the number of specific jobs that actually exist in Nebraska. (Tr. 898.) The VE could not produce the form that she uses to record her data obtained when she performs a survey, but she records the total numbers of specific jobs electronically. (Tr. 899-900.) The ALJ granted Murphy's motion for the VE to produce documents, i.e.,

her notes, showing which employers the VE contacted when she performed when
determining the number of order caller and small products assembler jobs available in
Nebraska.  (Tr. 905-06.)  In response the VE produced a one-page blank form entitled
"Labor Market Survey."  (Tr. 317.)  The VE described the form as "the type of form used
for updating information on numbers of jobs" and stated that the "worksheets used in
research on the jobs of Order Caller and Small Products Assembler have been destroyed."
(Tr. 316.)  At the hearing, the VE testified that she destroys the forms after approximately
three months because the data needs to be updated.  (Tr. 904.)

Murphy argues that the VE failed to meet the reliability standard for expert testimony
set out in *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993) "[a]lthough this
case is a non-adversarial, administrative proceeding."  (Filing No. 18, at 21.)  However, the
Eighth Circuit Court of Appeals has stated that the rule of disclosing underlying facts or
data "is recommended in adversary proceedings."  *Baugus v. Sec'y of Hlth & Human Serv.,*
717 F.2d 443, 447 n.6 (8th Cir. 1983).

### A Significant Number of Available Jobs

Murphy argues that the 330 order caller and 175 assembler positions identified in
Nebraska do not amount to a significant number of positions as required by law.  In
deciding how to determine a "significant number" in a particular case, the Eighth Circuit has
acknowledged the following:

> A judge should consider many criteria in determining whether work exists in
> significant numbers, some of which might include: the level of claimant's
> disability; the reliability of the vocational expert's testimony; the reliability of
> the claimant's testimony; the distance claimant is capable of travelling to
> engage in the assigned work; the isolated nature of the jobs; the types and
> availability of such work, and so on. The decision should ultimately be left to

21

the trial judge's common sense in weighing the statutory language as applied
to a particular claimant's factual situation.

*Jenkins v. Bowen,* 861 F.2d 1083, 1087 (8th Cir. 1988) (quoting *Hall v. Bowen,* 837 F.2d

272, 275 (6th Cir. 1988)).

In *Hall v. Chater,* 109 F.3d 1255, 1259 (8th Cir. 1997), the Eighth Circuit considered

those factors and concluded that 218 order clerk and 122 information clerk jobs constituted

a "significant number."  Murphy has not cited any persuasive authority to support a finding

that the numbers testified to by the VE are less than "significant" numbers.

## CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision

is supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED that the decision of the Commissioner is affirmed, the appeal is

denied, and judgment in favor of the Defendant will be entered in a separate document.

DATED this 9th day of November, 2009.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge

22